Filed 8/28/13  P. v. Landry CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>BRIAN PAUL LANDRY,<br><br>    Defendant and Appellant. | G046993<br><br>(Super. Ct. No. 09CF1004)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Patrick Donahue, Judge.  Affirmed.

Kevin D. Sheehy, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Melissa Mandel and Warren Williams, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

A jury convicted defendant Brian Paul Landry of the first of two counts alleged against him, conspiracy to commit murder (Pen. Code, § 182, subd. (a)(1)).[1] A mistrial was declared with regard to the second count, murder (§ 187, subd. (a)), because the jury could not reach a unanimous verdict. A month later, in exchange for the prosecutor's agreement to dismiss a section 12022.53 gun enhancement, defendant pleaded guilty to the murder count. The trial court sentenced defendant to 25 years to life in prison on count two, staying pursuant to section 654 the separate 25 years to life sentence imposed on count one.

This appeal pertains solely to the admissibility of statements made by defendant to police. Defendant argues his confession consisted of involuntary statements induced by improper interrogation tactics. In particular, defendant contends the police improperly withheld *Miranda* warnings (*Miranda v. Arizona* (1966) 384 U.S. 436) until after they had questioned him in a coercive manner and obtained incriminating statements. (See *Missouri v. Seibert* (2004) 542 U.S. 600 (*Seibert*).) Finding no error in the court's ruling that defendant's confession was admissible, we affirm the judgment.

FACTS

On September 18, 2008, Darlene Saddler died in her Santa Ana residence. When Saddler was found, she was "lying motionless face down in the kitchen" with a kitchen knife in the back of her neck. Bullet fragments and a silver .22 caliber casing were found in the kitchen. Blood was spattered on the kitchen walls and ceilings. A bullet was removed from Saddler's brain at her autopsy. A forensic pathologist opined that Saddler's death was a homicide caused by three gunshot wounds to the head and a stab wound to the neck. Saddler's young daughter told her older brother (who found

---

[1] All statutory references are to the Penal Code.

Saddler) that a man had entered the house.[2] The coroner estimated the time of death as 9:30 a.m.

Defendant, who turned 18 on September 2, 2008, was linked to the murder of Saddler by several distinct strands of evidence.

First, defendant had a relationship with Saddler's teenage daughter, Paula K. (who did not testify). Early in 2009, police found defendant's phone number in Paula's cell phone records. Defendant met Paula in mid-2007 and had what defendant considered to be a romantic relationship with Paula after July 21, 2008. Jonathan Hanna claimed he was party to a three-way phone conversation with defendant and Paula that occurred in the summer of 2008 wherein the murder of Saddler was discussed. "Paula had stated that she [wanted] her mom to die and [defendant was] going to help." According to Hanna, Paula told him the next day that the plan was not going to happen. On a separate occasion in the summer of 2008, when Paula and Hanna were at defendant's residence, defendant showed Hanna a gun. According to Hanna, Paula was Hanna's girlfriend in 2008; Hanna met defendant in 2008 and considered him to be a friend. "Paula was one to cheat on" Hanna, so he would not be surprised if defendant was also her boyfriend at the same time. Hanna did not tell police about the three-way phone conversation or the gun when he was interviewed immediately after the murder. In his testimony, defendant denied the three-way phone conversation ever occurred but admitted he showed a Ruger handgun to Hanna.

Second, DNA evidence implicated defendant. Police investigators swabbed various blood spots in Saddler's home for DNA analysis. Defendant could not be excluded as the source of DNA found in one blood stain, on the edge of the front door.

---

[2] The parties stipulated that had Saddler's young daughter testified, she would have described the intruder as "Mexican, wearing dark clothing, like a costume, gloves, and a bank robber's mask, skinny, long hair, and armed with a firearm." The prosecutor conceded in his closing argument that defendant does not match all aspects of this description.

Defendant's DNA matched "at every loci examined by the Orange County crime lab." It was "[m]ore rare than 1 in 1 trillion that . . . DNA could randomly repeat in" the pattern matched by defendant's DNA. Defendant's DNA was not found on the kitchen knife used to stab Saddler or in other locations in the kitchen. DNA from both Saddler and an unknown male were found on the knife. This unknown DNA did not match the DNA of any of the approximately 20 people tested by police (including Hanna and Saddler's family members). In an attempt to explain how his blood could have been present on the front door, defendant testified that in August 2008, Paula whipped him with a tree branch causing defendant to bleed. Paula tended to defendant's wounds at her house.

Third, defendant possessed the firearm used in the Saddler murder both before and after the murder. As noted above, defendant admitted showing a Ruger handgun to Hanna in the summer of 2008. Pursuant to a search warrant, police found a disassembled Ruger handgun, a holster, and ammunition (including .22 caliber ammunition) at the Tustin residence of defendant's mother. A firearm specialist opined that the .22 casing found in Saddler's kitchen was fired from the gun found pursuant to the search warrant. Defendant testified that Hanna handed the gun to defendant after the murder occurred and told defendant to get rid of the gun. Defendant did not previously know Hanna had the gun.

Fourth and finally, defendant confessed to police that he murdered Saddler. A redacted version of the videotaped police interview with defendant was played for the jury and a transcript was introduced into evidence. Both the video and transcript are part of the appellate record. Detectives Fajardo and Fulcher conducted the interview, which consists of 131 transcript pages in the version of the transcript submitted to the jury. As measured by the time counter on the videotape (which includes both active interview time and down time), the entire interview took place over the course of approximately three hours. Defendant leaned back with his head in his hands for much of the initial portion of the interview. Toward the end, he rested his arms on the table in front of him.

4

Defendant talked softly throughout the interview.  He did not engage in extended monologues, regardless of the topic.  Basically, defendant responded to questions presented by the detectives; many of defendant's responses were simply noises acknowledging he was listening to the questions/comments of the detectives.

Defendant's confession, described in detail below, is the focus of this appeal.  Defendant denied the truth of his confession at trial, claiming he made the statements to protect Paula and also because he was intimidated by the police.


*Stipulated Facts*

Defendant filed a written motion seeking to exclude all of the admissions made during the police interrogation.  The parties stipulated to the following facts for purposes of the pretrial hearing.  "1)  On April 16, 2009 Santa Ana police detectives Fajardo and Fulcher were in Cypress, California, looking for Brian Landry;  [¶]  2) The detectives made contact with Mr. Landry in the area of Orange and Valley View, in Cypress sometime before 10:00 a.m. on April 16, 2009 while Mr. Landry was on foot; [¶]  3) At the time he was contacted, Mr. Landry was carrying two packs that contained various items of Landry's personal property;  [¶]  4) Mr. Landry agreed to accompany the detectives back to the Santa Ana police department;  [¶]  5) Detectives Fajardo and Fulcher drove Landry to the Santa Ana police department;  [¶]  6) Prior to being seated in the back seat of the detectives' vehicle, Mr. Landry's packs and personal property were placed in the vehicle's trunk;  [¶]  7) When Landry was escorted into the police station, his personal property remained in the detectives' trunk;  [¶]  8) The detectives also took a set of house keys that Landry was carrying prior to the start of the interview, which began at approximately 10:10 a.m.;  [¶]  9) When the house keys were taken, Landry was told that the officers would be using the keys to enter the homes of his mother and father, if necessary, in the process of serving search warrants that they had for those homes.  [¶]

5

10) None of the items of personal property, including the set of keys [were] returned to Landry."

*Testimony of Fulcher*

Detective Fulcher testified at the pretrial hearing. Sometime in early 2009, he began investigating defendant as part of the inquiry into the Saddler murder. On April 15, 2009, Fulcher obtained an arrest warrant for Landry. The next day, Fulcher looked for and found defendant in Cypress, California. Fulcher wished to interrogate defendant. Fulcher did not read defendant his *Miranda* rights when he came in contact with him or before the interview actually began. When asked whether he had "it in [his] mind at that point that [he was] going to arrest and take Mr. Landry into custody at some point," Fulcher responded, "Not at that point, no." Fulcher would not necessarily have placed defendant under arrest had defendant refused to cooperate. Fulcher claimed, "It would have really depended on other circumstances that took place throughout that day." Fulcher stated the arrest warrant was a "*Ramey* warrant" (see *People v. Ramey* (1976) 16 Cal.3d 263). Fulcher's understanding was that such a warrant was "essentially for arrest for an interview." Fulcher never actually told defendant about the arrest warrant because defendant agreed to accompany Fulcher to the police station for an interview. Fulcher denied he had ever received training to question suspects first, then provide *Miranda* warnings before asking the same questions. Fulcher claimed this technique was in use in the past, but he has not used it in "probably about ten years at least."

*Pre-miranda Interview*

The first 14 pages of the transcript consist of small talk between defendant and Fajardo, mostly pertaining to defendant's interest in joining the military. Even in this rapport-building portion of the interview, defendant was far from effusive. Fulcher then asked defendant general informational questions (e.g., full name, birthday, home address,

6

phone numbers, driver's license number, and social security number), to which defendant responded clearly.

On page 17, Fulcher stated: "I appreciate you coming down here, you know, talking with us. I know you got . . . your school and everything, and . . . you didn't have to come with us" to discuss the murder of Paula's mother. Defendant responded, "Well, I figured, you know, I'd try to help . . . cause it's crap what happened . . . ."

Fulcher asked about defendant's relationship with Paula. Defendant stated he met her last year during the school year, but "got to know her more . . . about June or July" of 2008. In response to further probing, defendant stated he became "[k]ind of" close friends with Paula, but they were not romantically involved. When asked whether he only saw Paula in a group, defendant responded, "It was, uh, a lot of the times just me and her, and then, uh, I met her mom through that, you know." Defendant added, "She seemed like a nice lady, you know." As the officers continued to ask defendant about his relationship with Paula, defendant mentioned a family issue with Paula's stepdad, who supposedly used crack and was kicked out of the family home after a fight in July or August of 2008.

Fulcher then asked about defendant's relationship with Saddler, which defendant described as "not too bad." Defendant initially denied Paula had problems with her mother. Follow-up questioning revealed there might have been "generic like, oh, me and my mom had an argument or fight." Fulcher also asked about defendant's (and Paula's) relationships with Paula's stepdad and siblings. The detectives later asked about Saddler and stepdad's drug use, as well as the possibility that stepdad had something to do with the murder.

Defendant stated he was no longer picking up Paula for school because he had graduated and now went to college. Defendant estimated it had been a couple weeks before the murder since he had been to Paula's house. He was still in touch with Paula

7

though. Asked about whether he remembered the the actual day of the murder, defendant responded, "Yeah, I was with my friend John and we were gonna go to the campus Christian thing, that starts at like 10:00 o'clock I think." "And I was waiting at the college with him, like a few hours beforehand." Defendant found out about the murder "like right after her school ended." Defendant was at the high school when police officers picked up Paula. Paula saw defendant and told him she was being taken by the police.

The detectives asked defendant if he had any thoughts on what should happen to Paula's stepdad if it were found he had murdered Saddler. After a 10 second pause, defendant initially responded, "No," then added later after being asked again, "I guess let the justice system decide." Defendant stated he had not attended Saddler's funeral because he did not know about it until after it happened.

The officers continued to focus on defendant's relationship with Paula and defendant's interactions with her. Defendant contacted Paula at Orangewood Children's Home, which is where Paula was taken after the murder. Paula never mentioned who she thought could have committed the murder. The officers suggested that, based on their conversations with Paula, defendant had a romantic interest in Paula. Defendant continued to deny he dated Paula. Fajardo mentioned the existence of a diary kept by Saddler, in which Saddler wrote an entry about defendant's feelings for Paula and his plans for the future. Defendant eventually admitted he found Paula attractive and was waiting for the future when Paula was old enough to have a more serious relationship. Defendant added that Paula's mom liked him because she thought defendant was "a nice guy."

When Fajardo stated, "You wanted to get married at one point," defendant responded affirmatively. Defendant agreed with Fajardo that Saddler "got a little pissy." But Saddler "said . . . I [could] go with them to Bakersfield, I think, and they, you know, live there, and then once, uh, she turned 18 we can" get married. Fajardo assured

8

defendant that they did not care about the age issue (presumably, the potential criminality of any sexual contact that may have occurred between defendant and Paula). Defendant claimed the relationship consisted of mostly "kissing" and denied anything else was occurring. Defendant claimed the marriage conversation occurred over the phone in August 2008. Defendant agreed he still loved Paula at the time of the interview. But defendant denied he was still dating Paula.

After noting he had interviewed "a shit load of people on this thing" and that many of Paula's friends had asked the police what was going on with the case, Fajardo asked defendant why he had not reached out to police to ask about the case. Defendant mumbled something. When asked whether he had thought about when the police were going to ask for his DNA, he said "Not really." Defendant provided unusual responses to questions about whether he was right- or left-handed, claiming that he "usually" writes with his left-hand but "usually" throws with his right-hand. Defendant also provided unclear responses about if and when he knew about Paula dating other boys.

At page 60 of the transcript submitted into evidence, the officers returned to the topic of Saddler, introducing negative pieces of information about her ("could be a bit of a bitch to put it lightly," "didn't treat people right," "brought a lot of trouble to herself, her family," "we know who she is and we know what she's about"). Defendant responded with noncommittal noises to most of these comments. The officers also revisited defendant's relationship with Paula's younger sister and the interactions between them.

At page 63, the officers reminded defendant of the extensive investigation process and the evidence uncovered. "[T]he investigation's getting to a point where . . . we've been able to eliminate a lot of people, and . . . we have unanswered questions at this point, okay. And some of those questions . . . , I think you could probably help us with some of these answers. . . . I know you kind of downplayed your . . . relationship

9

with . . . Paula." Defendant responded, "Mh-huh." In contrast to prior statements, defendant then agreed "kind of a little bit" that one of the reasons he had brought up love and marriage to Paula was he had sensed something going on between Paula and Hanna. At page 66, Fulcher stated, "I'm just gonna ask you straight up, man-to-man, okay. Are you trying to protect Paula right now?" "I'm talking about protect her from possible involvement in her mother's death?" Defendant responded, "No." He added, "I wouldn't think that she'd be able to do it. I mean she's at school." Defendant then agreed he had not shared everything he knew about Paula's relationship with her mother, adding Paula "had fights and what not, and she told . . . my friends like bruises that she had from her mom, so." The officers continued in this vein for several transcript pages (i.e., suggesting defendant was protecting Paula and he should tell everything he knew about the relationship between Paula and Saddler). Defendant provided additional details about the strained relationship between Paula and Saddler, including alleged physical abuse of Paula as related by Paula.

On page 71, Fulcher asked whether Paula ever told defendant she wanted Saddler dead. Defendant indicated Paula had not. A page later, defendant backtracked when asked what Paula would say: "I wish she was dead, you know. Uh . . . and asked, you know, if I could do it (unintell) . . . no, mh, that would screw up my life." The following ensued. FULCHER: "So, she, she flat outright asked you to, to kill her mom by saying I wish she was dead, can you do it?" DEFENDANT: "Yeah, kind of like a round about way." FULCHER: "A round about way. How many times do you think she asked you that?" DEFENDANT: "A couple times." Over the next several pages of transcript, Fulcher restated various facts and described the circumstances of defendant's relationship as perceived by Fulcher. Fulcher added commentary suggesting it was a very "combustible set of circumstances," citing in particular defendant's relationship with Paula ("a very attractive young lady") and Saddler's abuse of Paula.

10

At page 74, Fulcher wondered "if all that stuff didn't come together . . . into something tragic that happened." He continued, "And that leads us to the point of, of having to ask you did you take it upon yourself to try to help Paula out in this situation?" DEFENDANT: "I printed out the papers for like Child Services, trying to get, you know, uh, I went to the Penal Code by the website" "to find, uh, child abuse things." FAJARDO: "You're missing the point, Brian." DEFENDANT: "Yeah." FAJARDO: "Totally missing the point. You've made some mistakes, man." DEFENDANT: "Mh." FAJARDO: "We're not sitting here judging you, but it is what it is, man. It is what it is. You find yourself here for a reason, but we're just trying to get down to the bottom. So we know there was many different factors that put you in that situation. We know that." DEFENDANT: "Mh-huh." FAJARDO: "You made some mistakes, and you need to fill in some of these gaps here. I know that without [Saddler] in the picture you and Paula got a future. I think you chose to take a different path and take care of this. I'm not saying you're a bad person, I'm not saying that, (sigh), I'm not saying you're an asshole. I don't care, I don't know you like that, but there's some gaps in the story" "that make us sit here looking at the individual that is responsible for [Saddler's] death. There is no other way to put it, man, Brian." DEFENDANT: "Mh-huh."

The interrogation continued in this fashion (i.e., officers indicating defendant murdered Saddler and presenting their theories of why defendant murdered Saddler, with defendant providing mostly minimal responses). At one point, one of the detectives suggested that if they "thought straight out you were just, you just did it for shits and giggles, I'm going to kill this bitch, (unintelligible) I would have said put your hands on your fricken head right now, turn around put your hands, we're going to cuff you, but because we know there's other factors and, and possibly a reason why this happened, okay, we wanted to know from you, to get your side of the story . . . ." The detectives encouraged defendant to tell the truth, calling on his honor as a man. The detectives also related their view of Paula as a manipulator.

11

At several points, defendant resisted the detectives' logic. FAJARDO: "You didn't tell me what happened that day. You forget [the younger daughter]. You forget forensics. We found (unintell) . . . there, Brian. What the fuck happened? What made you go that route?" DEFENDANT: "I was with my friend John." FAJARDO: "No you weren't. You can say that, but you weren't, unfortunately. The pieces to the puzzle, man, that's what it came down to. Now if you're saying that she put you up to this, fuck it then, then say it and we'll deal with her. I'm not putting those words in your mouth, but I need to hear it from you. Why'd you kill [Saddler]?" DEFENDANT: "I didn't. It may look like it, but I didn't." In response to a question regarding how defendant felt about what the detectives had said, defendant replied, "[k]ind of pressured." When told he looked nervous, defendant retorted, "But I've had coffee too."

Fajardo ambiguously stated, "You know this will be your only opportunity to hear your side." But Fulcher clarified this remark, "And basically what my partner just said to you, um, once we get up and walk out of here that's it, we're done, okay. Then it's up to the courts and, and through all that. This is your opportunity" "to give us your side of this. We're, we're totally willing to listen."

The detectives then suggested to defendant that they had obtained his DNA and had followed defendant as part of their investigation. Fajardo expressed how important it was for defendant to finally tell the truth: "I don't see you having any other option, man. I really don't. You need to just lay it out on the table and say, this is what fucking happened, this is how it happened, and this is why. I don't see . . . any other choice. Why would you leave it up to us, or, or better yet, a fucking sharp, little fucking girl to interpret your actions? Why? That's all, they're all lies inside of you, in your head and your heart. I can't put words in your mouth, man. You sit there cool, calm and collect[ed], but unfortunately all the jury is gonna see is you sitting here cool, calm and collect[ed] in a recorded room." "You know. They're gonna say, fuck, this guy don't care, he didn't give a fuck about her, look at him he's got his arms on his fucking head,

12

kicking back, all he needs is a cigarette and fucking beer and he's having a good time. And if you don't think the jury . . . looks at people like that, then you're mistaken. Yeah, audio and video." Fajardo empathized with defendant putting up with Paula's constant requests to kill Saddler. The detectives mentioned the importance of showing remorse.

On page 86, as the officers continued to pepper defendant with questions and commentary, defendant asked, "Doesn't there [have] to be like *Miranda* Rights or something here?" FAJARDO: "Well, there could be, I mean." FULCHER: "What, what, what are you trying to say?" DEFENDANT: "Well, cause, um, it's just a, uh, read the Mir . . . *Miranda* Rights, whatever." FULCHER: "Well (unintell) . . . DEFENDANT: "You know if you're doing like interviewing. (Sniffle)." FAJARDO: "You . . . weren't arrested." DEFENDANT: "Oh." FULCHER: "You're not, you're not under arrest." DEFENDANT: "Right." FULCHER: "I'll put it right out there if that's . . . something you want, we, we'll definitely do it." DEFENDANT: "That's fine." FULCHER: "Okay." DEFENDANT: "Alright." FULCHER: "Is that, is that something you want, you want done?" DEFENDANT: "No, that's fine." FAJARDO: "You know, we're we're trying to fill in the gaps. I mean don't wanna put words in your mouth though either, you know."[3]

After this exchange, the officers returned to questioning defendant about the murder of Saddler, interspersing questions about whether defendant was ashamed about what he did, whether he injured himself, and how defendant would feel if someone had done this to his mother. The officers returned to the topic of how defendant's

---

[3] At the pretrial hearing, Fulcher testified that he did not read defendant his *Miranda* rights because defendant "was not in custody." Defense counsel asked what would have happened had defendant stated he would not talk anymore. Fulcher testified he would have stopped talking to defendant. As for letting defendant go, "It was a decision we would have had to have made at that point. We were also executing search warrants at that time. Based upon what we may or may not have found in those search warrants [we] could have determined whether we elected to arrest or let him go."

13

demeanor would come across to a jury. "You showed a glimpse of remorse when you shut your eyes, man." "[Y]ou're coming off as . . . somewhat I don't give a fuck. It doesn't even look . . . real. It almost looks immature." When asked why he would not talk, defendant responded he was "just scared." After Fajardo confirmed defendant was scared of going to jail, Fajardo noted "well, you probably will go to jail."

At this point, on page 90 of the transcript, the officers took a short break and offered defendant a drink of water. When he returned, Fulcher indicated that "since you brought up the whole, that *Miranda* thing" "I'm gonna go ahead and read it to you just to make everybody feel comfortable. This way we're all cool with it, okay."

*Statement of Miranda Rights*

Fulcher stated he would read defendant his rights, pausing after each section to inquire whether defendant understood. FULCHER: "Okay. Alright. You have the right to remain silent. Do you understand?" DEFENDANT: "Yes." FULCHER: "Anything you say may be used against you in court. Do you understand?" DEFENDANT: "Yes." FULCHER: "You have the right to an attorney before and during any questioning. Do you understand?" DEFENDANT: "Not exactly." FULCHER: "In other words, you have the right to contact a lawyer at . . . anytime you want. It could be now, it could be later, you have the right to an attorney." DEFENDANT: "Right." FULCHER: "At all times. Understand that?" DEFENDANT: "Mh-huh, yeah, yes." FULCHER: "Yes. If you cannot afford an attorney, one will be appointed to you before questioning if you wish. Do you understand? DEFENDANT: "Yeah, yes." FULCHER: "Basically, what this means is if you don't have the money, you know, the, the government will give you the money to, to have an attorney." DEFENDANT: "Right." FULCHER: "Um, can we talk about what happened?" DEFENDANT: "Yes." Fulcher and defendant signed a document memorializing the

14

provision of defendant's *Miranda* rights, certain personal items were taken away from defendant (e.g., a belt), and defendant took a break to use the restroom.

*Post-Miranda Interview*

When questioning recommenced, defendant quickly and clearly confessed to the murder of Saddler (although he did so by responding to questions rather than telling a chronological story of what happened). When asked how he got into the house, defendant responded that he opened the front door from the inside by reaching his arm through the mail slot. Defendant looked around when he entered the house; hid in another room while Saddler was dropping Paula off at school. Defendant approached Saddler from the side as Saddler prepared food in the kitchen.

Defendant first claimed he "kind of blanked out" after he approached Saddler. When asked if he took weapons with him, defendant responded "a blade." After he was reminded that the police collected evidence at the scene, defendant was asked whether he had a gun with him. Defendant paused for 20 seconds, then said, "Yeah." Defendant shot Saddler two or three times. Defendant then grabbed a knife on the counter and severed Saddler's spine. Defendant collected two of the bullet casings, leaving one behind; he could not find the third casing. Defendant claimed he got rid of the gun. It was his grandmother's old gun.

After prompting and a series of leading questions, defendant stated he saw Saddler's young daughter and reassured her that he would not hurt her. Defendant tried to comfort the girl after killing Saddler. Defendant walked out the front door and rode his bicycle home. Defendant wore black pants, a black jacket, boots, and a "face thing," which he carried in a backpack on his bicycle. Defendant sent a text message to Paula indicating, "it's done." Paula had told defendant she wanted this done "too many" times over the previous months. Defendant had a three-way conversation with Paula and Hanna "like a month or so" before the murder. Hanna was not involved in the planning

15

of the murder as it went forward. Defendant was finally convinced to go through with the murder by Paula's threat to kill herself and Saddler. Paula assisted defendant's plan by telling him how to get inside the house. Defendant and Paula talked about the murder the night before it happened.

Toward the end of the interview, after his confession, defendant asked the detectives, "That's capital, isn't it?" Fulcher avoided answering the question, noting "there's a lot of factors that . . . come into capital" and the punishment determination will be up to "lawyers." The officers revisited the facts one more time, then handcuffed defendant and informed him he would taken to jail.

*Court's Ruling*

The court, considering the "totality of the circumstances," concluded defendant was in "custody" slightly more than halfway through the interrogation. In support of its conclusion that defendant was not in custody from the beginning of police contact on April 16, 2009, the court cited the lack of a formal arrest, the lack of handcuffs, defendant's lack of awareness of the arrest warrant, and the conduct of the "interview in a quiet, calm manner" without the officers raising their voices. As for the court's finding that custody began during the interview, the court noted the officers began to focus on defendant as a suspect rather than merely a source of information. The court added that defendant asked about *Miranda* nine pages after this focus began, at which point "a reasonable person would believe they were not free to go[, e]specially with the added fact that . . . keys were taken and they were going to be used for a search warrant."[4]

_____

[4]   It appears that the post-custody, pre-*Miranda* warning portion of the interrogation was introduced into evidence. Apparently defendant preferred to include this portion of the interview in evidence to provide context for his argument to the jury that his post-*Miranda* confession was false and involuntarily extracted. The parties do not discuss this issue in their briefs.

16

The court found defendant was advised of his rights pursuant to *Miranda* and understood those rights. "The *Miranda* advisement was read . . . approximately three pages [after defendant mentioned *Miranda*]." "[T]he officer did slightly minimize *Miranda* when he came back and mentioned it . . . ." But the actual statement of *Miranda* rights was thorough and careful, including a further explanation to a question asked by defendant.

Finally, again based on the "totality of the circumstances," the court concluded defendant's confession was voluntary. Defendant did not confess prior to the reading of his *Miranda* rights and, as such, *Siebert*, *supra*, 542 U.S. 600, was not particularly applicable. Moreover, regardless of whether the detectives acted intentionally or unintentionally in delaying the reading of *Miranda* warnings until about two hours into the interview, the provision of the *Miranda* warnings under the circumstances of this case effectively advised defendant that he had a choice going forward as to whether to provide an admissible statement. Defendant's "ability to reason, comprehend, or resist" were not "so disabled that he was incapable of free or rational choice." The detectives did not raise their voices, "even when the accusatory questions were being asked." The detectives remained seated during the interrogation. Landry was seated with his hands behind his head. "There were no threats or promises. The interview was conducted in a calm, nonthreatening manner. In the video [defendant] appears relaxed."

## DISCUSSION

Defendant contends his confession was inadmissible because it was unconstitutionally extracted against his will. Defendant's argument is threefold: (1) defendant was young (18 years old) and unfamiliar with the criminal justice system, thereby making him particularly susceptible to coercive police tactics; (2) the police used

17

improper pressure tactics, such as insisting on defendant's guilt and offering implied promises of leniency in exchange for a confession; and (3) the police withheld *Miranda* warnings on the pretext that they believed defendant was not in custody, waiting to provide *Miranda* warnings after defendant had already been coercively questioned.

*General Principles Applicable to Determination of Whether Confession is Voluntary*

"'The Fourteenth Amendment to the federal Constitution and article I, section 15, of the state Constitution bar the prosecution from using a defendant's involuntary confession. [Citation.] [These provisions] require[] the prosecution to establish, by a preponderance of the evidence, that a defendant's confession was voluntary. . . . [¶] Under both state and federal law, courts apply a "totality of the circumstances" test to determine the voluntariness of a confession.'" (*People v. Holloway* (2004) 33 Cal.4th 96, 114 (*Holloway*).) "We accept a trial court's factual findings, provided they are supported by substantial evidence, but we independently review the ultimate legal question." (*People v. Scott* (2011) 52 Cal.4th 452, 480.) "When, as here, the interview was tape-recorded, the facts surrounding the giving of the statement are undisputed, and the appellate court may independently review the trial court's determination of voluntariness." (*People v. Vasila* (1995) 38 Cal.App.4th 865, 873.)

"A statement is involuntary if it is 'not "'the product of a rational intellect and a free will.'"' [Citation.] The court in making a voluntariness determination 'examines "whether a defendant's will was overborne" by the circumstances surrounding the giving of a confession.' [Citation.] Coercive police tactics by themselves do not render a defendant's statements involuntary if the defendant's free will was not in fact overborne by the coercion and his decision to speak instead was based upon some other consideration." (*People v. Rundle* (2008) 43 Cal.4th 76, 114 (*Rundle*), disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) Factors to

18

consider in determining voluntariness include "'"'"the crucial element of police coercion [citation]; the length of the interrogation [citation]; its location [citation]; its continuity' as well as 'the defendant's maturity [citation]; education [citation]; physical condition [citation]; and mental health.'"'"'" (*People v. Boyette* (2002) 29 Cal.4th 381, 411; see also *In re Shawn D.* (1993) 20 Cal.App.4th 200, 209 [defendants's "age, sophistication, prior experience with criminal justice system, and emotional state" are relevant factors].)

"'It is well settled that a confession is involuntary and therefore inadmissible if it was elicited by any promise of benefit or leniency whether express or implied. [Citations.] However, mere advice or exhortation by the police that it would be better for the accused to tell the truth when unaccompanied by either a threat or a promise does not render a subsequent confession involuntary. . . . Thus, "[w]hen the benefit pointed out by the police to a suspect is merely that which flows naturally from a truthful and honest course of conduct," the subsequent statement will not be considered involuntarily made. [Citation.] On the other hand, "if . . . the defendant is given to understand that he might reasonably expect benefits in the nature of more lenient treatment at the hands of the police, prosecution or court in consideration of making a statement, even a truthful one, such motivation is deemed to render the statement involuntary and inadmissible . . . ."'"' (*Holloway*, *supra*, 33 Cal.4th at p. 115.)

"The business of police detectives is investigation, and they may elicit incriminating information from a suspect by any legal means. '[A]lthough adversarial balance, or rough equality, may be the norm that dictates trial procedures, it has never been the norm that dictates the rules of investigation and the gathering of proof.' [Citation.] 'The courts have prohibited only those psychological ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable.'" (*People v. Jones* (1998) 17 Cal.4th 279, 297-298.) Suggesting possible justifications for a homicide is not coercive; this tactic instead

19

suggests "possible explanations of the events and offer[s] defendant an opportunity to provide the details of the crime." (*People v. Carrington* (2009) 47 Cal.4th 145, 171.)

*Miranda and its Applicability to Police Interviews*

"As a prophylactic safeguard to protect a suspect's Fifth Amendment privilege against self-incrimination, the United States Supreme Court, in *Miranda*, required law enforcement agencies to advise a suspect, before any custodial law enforcement questioning, that 'he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.' [Citations.] If the suspect knowingly and intelligently waives these rights, law enforcement may interrogate, but if at any point in the interview he invokes the right to remain silent or the right to counsel, 'the interrogation must cease.'" (*People v. Martinez* (2010) 47 Cal.4th 911, 947.) "Failure to administer *Miranda* warnings creates a presumption of compulsion. Consequently, unwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded from evidence under *Miranda*." (*Oregon v. Elstad* (1985) 470 U.S. 298, 307 (*Elstad*).) The "*Miranda* presumption" is "irrebutable for purposes of the prosecution's case in chief . . . ." (*Id*. at p. 307.)

Law enforcement officers "are not required to administer *Miranda* warnings to everyone whom they question." (*Oregon v. Mathiason* (1977) 429 U.S. 492, 495.) "'Absent "custodial interrogation," *Miranda* simply does not come into play.'" (*People v. Ochoa* (1998) 19 Cal.4th 353, 401.)[5] "There is no requirement that police stop

_____

[5] "Custody determinations are resolved by an objective standard: Would a reasonable person interpret the restraints used by the police as tantamount to a formal arrest? [Citations.] The totality of the circumstances surrounding an incident must be considered as a whole. [Citations.] Although no one factor is controlling, the following circumstances should be considered: '(1) [W]hether the suspect has been formally

20

a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make. Volunteered statement of any kind are not barred by the Fifth Amendment and their admissibility is not affected" by the absence of a reading of *Miranda* rights. (*Miranda*, *supra*, 384 U.S. at p. 478, fn. omitted.)

"In midstream *Miranda* cases (where a defendant is interviewed before and after the giving of *Miranda* warnings), a defendant's postwarning inculpatory statements are generally admissible if the prewarning statements *and* the postwarning statements were voluntarily made. [Citation.] But where law enforcement uses a two-step interrogation technique 'in a calculated way to undermine the *Miranda* warning,' curative measures must be taken to ensure that a reasonable person would understand the *Miranda*

---

arrested; (2) absent formal arrest, the length of the detention; (3) the location; (4) the ratio of officers to suspects; and (5) the demeanor of the officer, including the nature of the questioning.' [Citation.] Additional factors are whether the suspect agreed to the interview and was informed he or she could terminate the questioning, whether police informed the person he or she was considered a witness or suspect, whether there were restrictions on the suspect's freedom of movement during the interview, and whether police officers dominated and controlled the interrogation or were 'aggressive, confrontational, and/or accusatory,' whether they pressured the suspect, and whether the suspect was arrested at the conclusion of the interview." (*People v. Pilster* (2006) 138 Cal.App.4th 1395, 1403-1404, fn. omitted.)

"[A] police officer's subjective view that the individual under questioning is a suspect, if undisclosed, does not bear upon the question whether the individual is in custody for purposes of *Miranda*. . . . Save as they are communicated or otherwise manifested to the person being questioned, an officer's evolving but unarticulated suspicions do not affect the objective circumstances of an interrogation or interview, and thus cannot affect the *Miranda* custody inquiry. . . . An officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned. [Citations.] Those beliefs are relevant only to the extent they would affect how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her '"freedom of action."' [Citation.] Even a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest." (*Stansbury v. California* (1994) 511 U.S. 318, 324-325.)

advisement and the significance of waiving *Miranda* rights." (*People v. Camino* (2010) 188 Cal.App.4th 1359, 1363-1364 (*Camino*).)

"'Even when a first statement is taken in the absence of proper advisements and is *incriminating*, so long as the first statement was voluntary a subsequent voluntary confession ordinarily is not tainted simply because it was procured after a *Miranda* violation. Absent "any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will," a *Miranda* violation — even one resulting in the defendant's letting "the cat out of the bag" — does not "so taint[] the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period." [Citations.] Rather "there is no warrant for presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of *Miranda*, was voluntary. The relevant inquiry is whether, in fact, the second statement was also voluntarily made."'" (*People v. Scott*, *supra*, 52 Cal.4th at p. 477.) "'A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement.'" (*People v. San Nicolas* (2004) 34 Cal.4th 614, 639.)

These principles are derived from two United States Supreme Court cases. *Elstad*, *supra*, 470 U.S. 298, "held that a suspect who responds 'to unwarned yet uncoercive questioning' may later waive his rights and confess after being 'given the requisite *Miranda* warnings.'" (*Camino*, *supra*, 188 Cal.App.4th at p. 1368.) In *Elstad*, police arrived at the residence of a burglary suspect with an arrest warrant. (*Elstad*, *supra*, 470 U.S. at p. 300.) Before escorting the suspect to the patrol car and without reading the suspect his *Miranda* rights, an officer interacted with the suspect in the suspect's living room (i.e., do you know why we are here, do you know the victim, the police think you are involved), whereupon the suspect made an incriminating statement to the effect that he was present at the burglary. After he was read his *Miranda* rights at the police station, the suspect confessed to his role in the burglary and signed a written

22

statement describing his conduct. (*Elstad*, at p. 301.) It was conceded that the suspect was in custody at the time of his first incriminating statement. Thus, the initial *Miranda* violation rendered the first statement inadmissible. (*Elstad*, at p. 302.) But, reversing the state appellate court, the Supreme Court held the postwarning confession could be introduced against the defendant. (*Id*. at p. 300.) "It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period." (*Id*. at p. 309.)

In *Seibert*, the court "test[ed] a police protocol for custodial interrogation that calls for giving no warnings of the rights to silence and counsel until interrogation has produced a confession. Although such a statement is generally inadmissible, since taken in violation of *Miranda* [citation], the interrogating officer follows it with *Miranda* warnings and then leads the suspect to cover the same ground a second time." (*Seibert*, *supra*, 542 U.S. at p. 604 (plur. opn. of Souter, J.).) The question before the court was the "admissibility of the repeated statement." (*Ibid*.) In a fractured set of opinions, the court held the repeated statement was inadmissible. (*Ibid*.)

In his concurring opinion, Justice Kennedy stated that the interrogation technique at issue amounted to a deliberate violation of *Miranda*, intentionally designed to circumvent its protections. (*Seibert*, *supra*, 542 U.S. at pp. 618, 620 (conc. opn. of Kennedy, J.).) "If the deliberate two-step strategy has been used, postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made. Curative measures should be designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver." (*Seibert*, *supra*, at p. 622 (conc. opn. of Kennedy, J.).) "This narrower test — that excludes confessions made after a deliberate, objectively ineffective mid-stream

23

warning — represents *Seibert*'s holding.  In situations where the two-step strategy was not deliberately employed, *Elstad* continues to govern the admissibility of postwarning statements."  (*United States v. Williams* (9th Cir. 2006) 435 F.3d 1148, 1158; see also *Camino*, *supra*, 188 Cal.App.4th at p. 1370.)

*Analysis*

Our independent review of the video and transcript of the interrogation indicates that defendant's admissions and confession were voluntary and not coerced.  There were no "impermissible threats of punishment or promises of leniency." (*Holloway*, *supra*, 33 Cal.4th at p. 115.)  By insisting they wanted to hear defendant's story and encouraging him to show remorse and fill in the gaps in the detectives' knowledge, the detectives cannot reasonably be deemed to have conveyed an offer of lenient treatment in exchange for a confession.  The officers did not mischaracterize the law; indeed, they said little to nothing about the law.  (Cf. *People v. Cahill* (1994) 22 Cal.App.4th 296, 306-307, 315 ["materially deceptive" explanation of law by omission of felony murder rule led to confession procured by false promise of leniency].)

An interrogation room in the police station is not the most comfortable environment.  Moreover, the detectives subjectively considered defendant to be a suspect and withheld this information, presumably in the hope that by doing so the interrogation would be more successful.  But, with the exception of their penchant for using conversational profanity, the detectives were mild mannered in the conduct of the interview.  They did not intimidate defendant physically or verbally.  The interview was not unreasonably long, and defendant was provided with restroom access and beverages. (See *People v. Jablonski* (2006) 37 Cal.4th 774, 815-816 [interview spread over four hour period with refreshment and lunch break not coercive]; *People v. Thomas* (2012) 211 Cal.App.4th 987, 1011 [17 year old's four hour interview by "two experienced detectives" not coercive under totality of circumstances].)  Defendant was an adult who

24

was enrolled in college; there is no evidence in the record suggesting he suffered from mental or physical illness that would preclude him from telling the truth or declining to participate in the interview. Certainly, both the transcript and the video evidence of defendant's interrogation depict an individual who was evasive and reluctant to talk about his role in Saddler's murder. The police officers engaged in legitimate tactics to overcome defendant's reluctance — developing a rapport with defendant, verbally empathizing with defendant's situation vis-à-vis Paula, offering possible motives for defendant's actions, confronting defendant with evidence (e.g., the DNA), and imploring defendant to tell his side of the story. Defendant's confession and associated admissions, both before and after the *Miranda* warnings, were made voluntarily.

We likewise conclude the court correctly found a *Seibert* violation did not occur. As the court found, defendant was in custody before the topic of *Miranda* was raised. The first, pre-custodial segment of the interview focused on obtaining information about Saddler's family members, particularly Paula and the stepfather. It was not until about halfway through the interview that the questioning suggested defendant was a focus of the investigation. At that point, the court ruled defendant was in custody. Although defendant never actually invoked his right to remain silent or right to an attorney (either before or after having his *Miranda* rights read to him), he raised *Miranda* himself and the police did not immediately stop the interview to read defendant his rights. It is certainly reasonable to take issue at the margins with the process followed by the police in this case.

But *Seibert* does not compel the exclusion of defendant's voluntary confession under the circumstances of this case. Defendant does not actually argue in his brief that he was in custody from the beginning of the interview or at any time prior to the point of the interview that constituted custody according to the trial court. Thus, defendant was not interrogated in custody for long before the *Miranda* warnings were provided. As to this brief portion of the interview between the commencement of

25

custody and the provision of *Miranda* warnings, there is no evidence in the record suggesting the police followed a policy to question first, provide *Miranda* rights later. Fulcher denied the existence of such a policy or practice and attributed the conduct of defendant's interrogation to his custody determination.  And although defendant made some admissions that were harmful during the first portion of the interview (i.e., admitting Paula had asked defendant to kill Saddler), the court was correct in concluding the police did not extract an actual confession from defendant until after his *Miranda* rights were read to him.  Fulcher carefully read defendant his *Miranda* rights and defendant subsequently agreed to continue talking about the Saddler murder.  Under the totality of the circumstances, defendant's pre-*Miranda* admissions and post-*Miranda* confession were voluntary.

DISPOSITION

The judgment is affirmed.

IKOLA, J.

WE CONCUR:

ARONSON, ACTING P. J.

THOMPSON, J.

26